**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ESTATE OF CLINT LONG, by and through its personal representative GAGE LONG, and
GAGE LONG,

       Plaintiffs,

v.

NATCORE HEALTHCARE INDUSTRIES, INC.,
DANIEL VAUGHT,
SHERIFF ALLEN COOPER, in his official and individual capacities,
THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF FREMONT,
ADAM BEATY,
DEREK IRVINE,
CARRIE HAMMEL, and
FNU ALCORN.

       Defendants.

_____

**CIVIL RIGHTS COMPLAINT AND JURY DEMAND**
_____

       Plaintiffs, through their attorney, Aurora L. Randolph of ALR Civil Rights LLC, hereby

submit this Complaint against all Defendants and requests a trial by jury as follows.

## I.      INTRODUCTION

       1.      In 2020, Clint Long, a 47-year-old pretrial detainee at the Fremont County

Detention Center (FCDC), was forced to suffer from untreated mental illness for more than a

month due to the deliberate indifference and negligence of Defendants.  Tragically, Mr. Long

eventually committed suicide after the FCDC officials and the jail's private medical contractor,

NatCore Healthcare Industries, Inc. (NatCore), flagrantly violated policies meant to ensure the safety and well-being of incarcerated people in crisis.

2.     Three days before his death, Mr. Long had so lost track with reality that he was no longer sure of his own name.  Mr. Long wrote a "kite" to medical staff at FCDC stating:

> i am and have been seeing dead people when I wake up in my cell at night.  They aren't dangerous but knowing they are not real is quite disturbing.  I need to see a psychiatrist asap.  I [have] been diagnosed since age 13 having ADD, BIPOLAR 1, AGROPHOBIA, MILD SCHIZOPHRENIA, and [since] Panama, PTSD...Thank you, Mr[.] Long. I think so?

3.     Mr. Long had a history of mental illness on record with the FCDC.  In the weeks leading up to his suicide, Mr. Long committed several documented acts of self-harm.  Mr. Long begged for psychiatric care.  But Defendants refused to provide him mental-health treatment and failed to put him on suicide watch or classify him as a Special Management Inmate, which would have entitled him to the protection of close monitoring by FCDC officials and NatCore staff.

4.     Mr. Long can be seen on jail video mentally and emotionally deteriorating over several weeks.  Still, Defendants denied Mr. Long treatment from a mental-health provider. Defendants failed to observe him at the correct intervals during the limited time they had him on medical watch.  And very tragically and foreseeably, Mr. Long ultimately took his own life. Even though he was in a cell with a continuous video feed to FCDC officials, Mr. Long prepared his own noose, tied himself up, and hung in his cell for approximately 37 minutes before his body was discovered.

5.     Defendants Sheriff Cooper and the Board of County Commissioners for the County of Fremont (BOCC) are ultimately responsible for ensuring the health, safety, and well-being of people incarcerated in FCDC.

6.      Defendants Cooper and BOCC shirked this responsibility, however, by hiring NatCore Healthcare Industries (NatCore) as FCDC's private medical provider and exercising no supervision or oversight of the brand-new company.

7.      Defendant Daniel Vaught, a medical provider from FCDC, founded NatCore to provide a cheaper medical care contract to his friends at the Fremont County Sheriff's Office (FCSO).

8.      Choosing the enrichment of their friends over the well-being of the people in their care, Defendants Cooper and the BOCC chose to hire the brand-new company of a friend rather than search for the best—or even an adequate—medical provider.  Defendants Cooper and the BOCC contracted with NatCore without putting out a request for proposal for the contract or initiating any sort of competitive process, and Defendants Cooper and the BOCC did not investigate whether NatCore was an appropriate medical contractor.

9.      After contracting with their friend's company, Defendants BOCC, Cooper, and Hammel failed to train and supervise NatCore and NatCore's employees who were there to ensure the well-being of the people incarcerated at the FCDC.

10.     Moreover, Defendants BOCC, Cooper, Irvine, and Hammel failed to train FCDC staff to properly classify people incarcerated at FCDC, to house them appropriately based on their needs, and to intervene when people incarcerated at the FCDC did not receive adequate mental health care.  In fact, Defendants Cooper,  Irvine, and Hammel had personal knowledge of Mr. Long's self-injurious behaviors and lack of adequate medical care *over a week before he committed suicide* and failed to ensure that he was provided mental health care or classified and housed appropriately for his own safety.

3

11.    Unsurprisingly, NatCore proved incapable of providing constitutionally-adequate medical care to people in FCDC custody.  During 2020, NatCore was short staffed at least 74% of the time.  After at least a year of inadequate medical care and medical understaffing at the FCDC, Defendant Sheriff Cooper decided to cut ties with NatCore and hire a different private medical contractor.

12.    Mr. Long and his family are the victims of Defendants' repeated failures and deliberate misconduct in providing inadequate care to the incarcerated men and women inside FCDC.

## II.    JURISDICTION AND VENUE

13.    This action arises under the Constitution and laws of the United States and the State of Colorado.   This Court has original subject matter jurisdiction over the Plaintiff's civil rights claims under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights), the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq*., and Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 701, *et seq*. Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent state causes of action derive from a common nucleus of operative facts.  Jurisdiction supporting the claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

14.    This Court has personal jurisdiction over all the named Defendants because they either reside in the State of Colorado or they conduct systematic and continuous business within the State of Colorado.

15.     Venue in the District of Colorado is proper under 28 U.S.C. § 1391(b) because all of the events relevant to the claims contained herein occurred within the State of Colorado.

### III.     PARTIES

16.     At all times relevant to this Complaint, Clint Long was a citizen of the United States and a resident of the State of Colorado.  Mr. Long is a qualified individual with disabilities for the purposes of the ADA and Section 504.  At all relevant times, Mr. Long was a pretrial detainee at the FCDC.

17.     Gage Long, only child of the decedent Clint Long, has been a citizen of the United States of America and a resident of the State of Colorado.  Gage Long is also the personal representative of the Estate of Clint Long.

18.     Defendant NatCore Healthcare Industries, Inc. (NatCore), is a private corporation with its principal street address at 29121 Daniel Road, Pueblo, CO 81006.  NatCore conducts business in Colorado.  At all times relevant to this Complaint, Defendant NatCore contracted to provide medical services to people incarcerated in the FCDC and acted under the color of state law.

19.     Defendant Daniel Vaught is an individual residing in the State of Colorado.  Defendant Vaught is the registered agent, Chief Executive Officer, and medical provider for NatCore and was personally responsible for providing medical care to Mr. Long during his pretrial detention.  On information and belief, Defendant Vaught was the only medical provider for the incarcerated individuals at the FCDC at all times relevant to this Complaint.  At all times relevant to this Complaint, Defendant Vaught acted under the color of state law.

20.     Defendant Sheriff Allen Cooper is the Fremont County Sheriff.  At all times relevant to this Complaint, Defendant Cooper was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in his capacity as the Fremont County Sheriff.  As Sheriff, Defendant Cooper has independent, unilateral, and final authority to make policy decisions regarding the FCDC.  He is sued in his official and individual capacities.

21.     The Board of County Commissioners for the County of Fremont (BOCC) is the public entity responsible for approving the budget for the FCDC, for approving the contracts of FCDC, and for providing funds for the LCJ and its contracts.  The BOCC signed the agreement with Natcore for the provision of medical services at the times relevant to this Complaint.

22.     Defendants Sheriff Cooper, in his official capacity, and the BOCC are referred to herein as "Fremont County."

23.     Defendant Derek Irvine is the Fremont County Undersheriff.   At all times relevant to this Complaint, Defendant Irvine was a citizen of the United States, was a resident of the State of Colorado, and was acting under the color of state law in his capacity as the Fremont County Undersheriff.  As Undersheriff, Defendant Irvine has independent, unilateral, and final authority to make policy decisions regarding the FCDC.

24.     Defendant Carrie Hammel is an individual residing in the State of Colorado.  At all times relevant to this Complaint, Defendant Hammel was Division Commander of the detention division of the FCSO.  Defendant Hammel holds the position of Captain within the FCSO.  Defendant Hammel is the Division Commander of the FCDC, and has independent,

unilateral, and final authority to make policy decisions regarding the FCDC.  At all times

relevant to this Complaint, Defendant Hammel was acting under the color of state law.

25.     Defendant Adam Beaty is an individual residing in the State of Colorado.  At all

times relevant to this Complaint, Defendant Beaty was an employee of NatCore at FCDC, and

was acting under the color of state law in his capacity as a medical professional responsible for

providing medical care to Mr. Long during his incarceration.

26.     Defendant first name unknown (FNU) Alcorn is an individual residing in the State

of Colorado.  At all times relevant to this Complaint, Defendant Alcorn was an employee of

NatCore at FCDC, and was acting under the color of state law in their capacity as a medical

professional responsible for providing medical care to Mr. Long during his incarceration.

## IV.     FACTUAL ALLEGATIONS

**A.     Creation of Natcore and Fremont County's decision to contract with Natcore**

27.     In 2016, Defendant Vaught worked as a medical professional for Correct Care

Solutions, another private medical care company, at FCDC.  Correct Care Solutions had a

contract through the end of 2016 to provide medical care at FCDC.

28.     In 2016, Defendant Vaught approached then-Fremont County Sheriff James

Beicker with the idea that he (Vaught) could form a private medical care company if Mr. Beicker

would hire his company to provide medical care to FCDC inmates.

29.     Defendant Vaught and Mr. Beicker were and are friends.

30.     On information and belief, Defendant Vaught told Mr. Beicker that he could

provide medical care cheaper than Correct Care Solutions.

31.    Fremont County did not renew its contract with Correct Care Solutions after 2016.

32.    Defendant Vaught founded NatCore in October 2016.

33.    In December 2016, Fremont County—through the Fremont County Board of County Commissioners (BOCC)—signed a contract with NatCore to provide medical and mental health services to the individuals in the FCDC.

34.    The BOCC approved the contract through a quick vote on a consent agenda with five other items.

35.    The BOCC had no public discussion regarding the contract with NatCore.

36.    Fremont County did not put out a request for proposals or bids to the public for the 2017 medical care contract to ensure they were getting an adequate provider.

37.    Fremont County did not compare NatCore with other potential medical providers in considering who their next medical contractor should be.

38.    Fremont County did not investigate the company—which was founded approximately one month before the contract was signed—in any way before it contracted with it.

39.    Fremont County signed the contract with NatCore because Mr. Beicker was and is friends with the CEO of NatCore, Defendant Vaught.

**B.    Mr. Long's personal history, struggle with mental illness, and incarceration at the FCDC**

40.    Mr. Long was born in Kentucky and moved to Colorado later in his life.  Mr. Long worked in construction on various projects like roofing and concrete.

41.     Mr. Long had one child, Gage Long, who is now an adult.  At the time of Mr. Long's death, Gage had recently moved to Colorado, and the two had begun building their relationship.  Mr. Long called Gage his "little man."

42.     Mr. Long was mentally ill and had been diagnosed with several mental health problems including mood disorder, bipolar, attention deficit hyperactivity disorder (ADHD), anxiety, and depression.

43.     These diagnoses interfered with Mr. Long's basic life activities such as caring for himself, communicating, thinking, interacting with others, and working, among others.

44.     Mr. Long found himself in and out of Fremont County's custody and incarcerated in the FCDC from 2018 until the time of his death.

45.     In October 2018, Fremont County officials incarcerated Mr. Long in the FCDC, where a NatCore official conducted an initial mental health evaluation.  The evaluation noted Mr. Long's unspecified mood disorder, severe drug use, mania, paranoia, anxiety, depressive symptoms, past mental health treatment, previous prescriptions of psychotropic medications, and extensive history of head injuries.  The NatCore official recommended he be referred to a psychiatrist for medication evaluation and that he receive individual therapy.

46.     During that October 2018 evaluation, Mr. Long stated that he felt "down, depressed, or hopeless," and that for several days during that time he had "thoughts that [he] would be better off dead, or of hurting [himself]."  He indicated these problems made his life "very difficult."  Based on his answers to this questionnaire, NatCore diagnosed him with moderately severe depression.

47.     In 2018 and 2019, Mr. Long submitted many kites to NatCore staff, including Defendant Beaty, requesting mental-health care and communicating his concerning symptoms of mental illness.

48.     For example, on September 24, 2018, Mr. Long wrote a "kite" to NatCore staff reporting that he was bipolar, was not sleeping, and was "starting to hear thosee men talking in my head again I 0lease help me [*sic*]."  NatCore staff responded the request would be forwarded to the provider.  Thus, Defendant Vaught was aware of this request and Mr. Long's mental illness at this time.

49.     And on August 9, 2019, Mr. Long wrote a "kite" to NatCore staff stating he needed to see a psychiatrist and the voices in his head were coming back.

50.     A July 2019 mental health assessment referred Mr. Long to receive mental health care.

51.     In August 2019, after Mr. Long returned to the FCDC from the hospital after suffering a seizure, FCDC officials found him bleeding from his face.  The FCDC officials noted in his medical record that they did not know how to treat Mr. Long, and NatCore had no medical personnel on duty.  The FCDC officials attempted to reach NatCore medical personnel *at home* via phone call and text messages.  After a delay, NatCore personnel returned the communications and provided the FCDC officials medical advice.

52.     Later in August 2019, FCDC officials found Mr. Long in his cell, puking blood.  FCDC officials attempted to reach a NatCore medical professional on his cell phone but could only leave a voicemail regarding the medical emergency.

53.     Mr. Long suffered unnecessarily during these incidents and others due to NatCore's systemic understaffing of medical staff throughout their contract with Fremont County.

**C.     Mr. Long's 2020 incarceration at FCDC**

54.     During a February 27, 2020 pre-admission medical screen for FCDC, Mr. Long answered all questions except for whether he had ever received mental health services.

55.     No NatCore medical professional reviewed or signed Mr. Long's medical screen.

56.     This failure to review and sign an intake screening violates the National Commission on Correctional Health Care (NCCHC) standard that mandates that medical personnel review all receiving screening results within 14 days.

57.     On March 1, 2020—five days after FCDC officials booked Mr. Long into the jail—Bailey Humphrey, a NatCore employee, completed a mental health assessment of Mr. Long.  Ms. Humphrey noted that Mr. Long had recently been taking psychotropic medication and wrote on his assessment that Mr. Long should see mental health.

58.     No NatCore physician reviewed Mr. Long's mental health assessment, and the portion of the assessment form for the physician's signature is blank.

59.     This also violates the NCCHC standard that mandates that all receiving screening results are reviewed within 14 days.

60.     No mental health provider treated or otherwise interacted with Mr. Long from the beginning of his incarceration on February 27, 2020, until after he had committed suicide on April 2, 2020.

61.     This failure to treat Mr. Long violates the NCCHC standards that mandate that people who screen positive for mental health problems upon entry into a correctional setting be referred to qualified mental health professionals for further evaluation.

62.     The failure to treat Mr. Long also violates the NCCHC standards that mandate that mental health evaluations of patients with positive screens be completed within 30 days or sooner if clinically indicated.

63.     On March 6, 2020, FCDC officials called NatCore medical staff to assist Mr. Long after observing him convulsing with blood near his mouth.  NatCore staff placed Mr. Long on a 30-minute medical watch.  This meant that Mr. Long should have been checked on every 30 minutes by NatCore and FCDC officials, who should have logged his condition until he was medically cleared.

64.     On March 7, 2020, NatCore and FCDC officials only checked Mr. Long in 30-minute increments about half of the time.

65.     On March 8, 2020, NatCore and FCDC officials only checked Mr. Long in 30-minute increments about half of the time.

66.     On March 12, 2020, doctors admitted Mr. Long to St. Thomas More Hospital and then transferred him to Penrose Hospital in Colorado Springs, Colorado, for seizures.  Hospital staff discharged him the next day with a prescription to address his seizures.  Upon his return to FCDC, NatCore staff placed him on 30-minute medical watch.

67.     On March 13, 2020, NatCore and FCDC officials failed to check on Mr. Long in 30-minute increments on several occasions.

68.     On March 14, 2020, Mr. Long voiced concerns to FCDC Deputy Mabbitt regarding his medications.  Mr. Long pleaded to speak with a commanding officer about his medical concerns, but no commanding officer spoke with Mr. Long.

69.     On March 16, 2020, FCDC officials called a medical emergency after observing Mr. Long shaking and finding blood near his head.  FCDC officials took Mr. Long to the hospital; hospital officials discharged him back to the FCDC the following morning.

70.     On March 17, 2020, NatCore and FCDC officials failed to check on Mr. Long in 30-minute increments on several occasions.

71.     On March 17, 2020, FCDC Deputy Glab witnessed and recorded Mr. Long snorting coffee creamer powder.

72.     On March 18, 2020—15 days before he committed suicide—Mr. Long told FCDC Deputy Murillo that "it feels like someone is pooring [sic] hot water on the left side of my brain."  Mr. Murillo recorded Mr. Long's statement in his medical record.

73.     FCDC Deputy Murillo did not get mental health care for Mr. Long.

74.     FCDC Deputy Murillo did not reclassify Mr. Long as a Special Management Inmate requiring additional observation and care.

*March 19, 2020*

75.     On March 19, 2020—14 days before he committed suicide—FCDC staff called NatCore personnel, including Defendant Beaty, to respond to a medical emergency in Mr. Long's cell.  Mr. Long had blood coming out of his ear and complained of his head burning.

76.     Defendant Beaty recorded that when he examined Mr. Long's ear for the source of blood, he observed a possible foreign body or digital trauma in the exterior or mid ear canal.

77.     In other words, Defendant Beaty concluded, and wrote in Mr. Long's medical record, that Mr. Long had stuck his finger or other object into his ear and purposefully harmed himself.

78.     Mr. Long complained of his head burning to Defendant Beaty and begged to be taken to the hospital.

79.     Defendant Beaty merely offered Mr. Long an ice pack and left him alone to allow him "to calm down."

80.     Defendant Beaty did not obtain mental-health care for Mr. Long, nor did he place Mr. Long on suicide watch or classify him as a Special Management Inmate.

81.     Defendant Beaty's failure to place Mr. Long on suicide watch despite Mr. Long's documented self-injurious behavior violated FCDC's policy on suicide prevention and intervention.

82.     On March 19, 2020, NatCore staff eventually placed Mr. Long on medical watch, but NatCore and FCDC officials failed to check on Mr. Long in 30-minute increments on several occasions.

83.     Later on March 19, 2020, FCDC officials called Defendant Beaty to check on Mr. Long again.  Defendant Beaty found Mr. Long laying on his side with blood coming from his nose.

84.     Defendant Beaty personally went to FCDC master control and reviewed camera footage of Mr. Long to determine when and how he got a bloody nose.

85.     Defendant Beaty observed and noted in Mr. Long's medical record that it appeared that Mr. Long gave himself a bloody nose, and Defendant Beaty wrote "[i]t is

suspected that [mechanism of injury] this pt inflicted this injury." Defendant Beaty referred to this as an "episode" of Mr. Long's.

86.     Defendant Beaty knew by at least March 19, 2020, that Mr. Long had been exhibiting self-injurious behavior.

87.     But Defendant Beaty did not get mental health care for Mr. Long, nor did he put Mr. Long on suicide watch.

88.     Defendant Beaty's failure to put Mr. Long on suicide watch despite Mr. Long's documented self-injurious behavior violated FCDC's policy on suicide prevention and intervention.

89.     On March 19, 2020, Mr. Long's criminal-defense attorney, Philip Dubois, filed an emergency motion for bond modification requesting alterations to Mr. Long's bond to allow for his immediate release given Mr. Dubois' concerns regarding Mr. Long's health.   In the motion, Mr. Dubois raised his concerns that "Mr. Long has serious medical conditions that are unstable and not managed at the jail ..." and that Mr. Long was experiencing violations of the Eighth Amendment at FCDC, and asked the Court "to remedy the resulting Eighth Amendment violation."

*March 20, 2020*

90.     On March 20, 2020—13 days before Mr. Long committed suicide—FCDC Deputies Wicklund and Hiles conducted a random inspection of Mr. Long's cell and found hidden pieces of broken glass.

91.     Broken glass in a correctional facility is considered contraband and is concerning because such materials can be used to hurt oneself or others.

92.     On March 20, 2020, NatCore and FCDC officials failed to check on Mr. Long in 30-minute increments on several occasions, sometimes with hours passing between observations.

93.     On March 20, 2020, Mr. Dubois filed an addendum to his emergency motion for bond modification for immediate release, noting Mr. Long's deteriorating medical condition and the failure of NatCore staff to care for Mr. Long or communicate with his defense team.  Mr. Dubois said when he saw Mr. Long his "skin color was orange and mottled."  Mr. Dubois said "[t]he jail's medical vendor's nurse will not communicate with the defense social worker.  On information and belief, Mr. Long has not been seen by a physician in the jail."  Mr. Dubois requested a hearing and requested the Court order Defendant Cooper to make NatCore's supervising employee—Defendant Vaught—appear to testify regarding Mr. Long and to bring a copy of Mr. Long's medical records.  Mr. Dubois stated that "Counsel believes that a subpoena issued by counsel will not be effective."

94.     For weeks, Mr. Dubois and the defense team had been trying to obtain information and records—at Mr. Long's request and with his permission—regarding Mr. Long's condition and treatment from FCDC officials and NatCore staff, without success.

95.     On March 20, 2020, Mr. Dubois also requested video from FCDC of Mr. Long while he was under medical watch in March 2020.  Defendant Hammel was made aware of the attorney's request the same day.

_March 21, 2020_

96.     On March 21, 2020—12 days before he committed suicide—Mr. Long asked a NatCore employee if he could leave isolation and return to general housing.  The employee told him that the provider must clear him from medical watch before he could be taken off.

97.     Mr. Long told the NatCore employee that he was "losing his mind," which the employee recorded in Mr. Long's medical record.

98.     FCDC policy on Special Management Inmates specifically notes and addresses "the possibility of self-inflicted injury and depression" during periods of separation and mandates regular inquiries regarding the person's attitude and outlook.  But again, Mr. Long was never classified as a Special Management Inmate by any FCDC officials or NatCore staff.

99.     On March 21, 2020, a NatCore employee contacted Defendant Vaught regarding Mr. Long's medical watch, and Defendant Vaught reviewed Mr. Long's medical record and said "pt is to remain on medwatch until he evaluates him or says otherwise due to manipulation."

100.     Defendant Vaught reviewed the instances of self-harm noted in Mr. Long's medical record.

101.     Defendant Vaught failed to get Mr. Long mental health care or to put Mr. Long on suicide watch or classify him as a Special Management Inmate.  Defendant Vaught's failure to put Mr. Long on suicide watch despite Mr. Long's documented self-injurious behavior violated FCDC's policy on suicide prevention and intervention.

102.     On March 21, 2020, NatCore and FCDC officials failed to check on Mr. Long in 30-minute increments on several occasions.

_March 22, 2020_

103.     On March 22, 2020, FCDC Deputy Curtis told FCDC Deputy Breeding that Mr. Long "had an 'episode' they are no longer are to be called 'siezures' [sic]."

104.     FCDC and NatCore personnel believed that Mr. Long had no medical emergencies in March 2020 but instead harmed himself on purpose.

105.    FCDC and NatCore personnel had grown frustrated by Mr. Long's mental illness and consciously deprived him of medical care, appropriate classification, and appropriate housing because of their frustrations.

106.    On March 22, 2020, NatCore and FCDC officials failed to check on Mr. Long in 30-minute increments on several occasions.

*March 23, 2020*

107.    On March 23, 2020—10 days before he committed suicide—Mr. Long complained to FCDC Deputy Nish that he was having "mental issues."  Officer Nish told Mr. Long that "from a medical standpoint there isn't any [sic] further [he] could do for him."  Mr. Long requested to talk to a supervisor, but Officer Nish did not seek an FCDC supervisor to speak with him.

108.    FCDC Officer Nish did not get mental health care for Mr. Long, nor did he put Mr. Long on suicide watch.

109.    On this day, Mr. Long was on one-hour medical watch, but NatCore and FCDC officials failed to check on Mr. Long for over two hours.

110.    Also on March 23, 2020, the Honorable Lynette Wenner of the 11th Judicial District Court sent an email about Mr. Long to FCSO Sergeant Billie Clark and FCSO Deputy Braxton Buffington.  Judge Wenner stated: "[t]here is a pending emergency motion to release Long from custody due to health reasons," and noted Mr. Dubois was "requesting the medical staff to appear for the hearing."  Judge Wenner attached the March 19, 2020 motion and March 20, 2020 Addendum filed by Mr. Dubois regarding Mr. Long's medical problems and the failure

of NatCore staff to treat him or communicate with his defense team regarding his condition and care.

111.    Mr. Buffington and Mr. Clark read the email and attachments regarding Mr. Long's medical problems and lack of treatment from NatCore staff.

112.    Neither Mr. Buffington nor Mr. Clark intervened to get Mr. Long medical attention or mental health care when this was brought to their attention—10 days before he committed suicide.

*March 24, 2020*

113.    By March 24, 2020—9 days before Mr. Long committed suicide— Captain Hammel and Mr. Vaught both received the emails and attachments from Judge Wenner.

114.    On information and belief, Defendants Hammel and Vaught spoke on the phone on March 24, 2020, regarding Mr. Long's medical condition and the treatment he needed for that condition.

115.    Defendant Hammel told Defendant Vaught that Mr. Long had been exhibiting self-injurious behavior.

116.    Also that same day, Defendant Hammel sent the email from Judge Wenner and the emergency bond modification motion to Defendant Cooper and Fremont County Attorney Brenda Jackson – saying "This is what is happening with the courts in reference to Mr. Long and I am in disbelief."

117.    Defendant Irvine was included on the email chain later in the day.

118.    The email conversation indicates the four Fremont County officials had previously discussed Mr. Long and his medical condition and care, but also shows that as of at

least March 24, 2020 all of the leadership of the FCDC and the county attorney were on notice that Mr. Long's health was deteriorating and he was not being provided the medical care he needed.

119.    On information and belief, by this date, Defendants Cooper, Irvine, and Hammel all knew that Mr. Long was self-harming, was mentally ill, was not receiving adequate medical or mental-heath care, and was not classified as a Special Management Inmate or on suicide watch.

120.    Nonetheless, they all failed to obtain adequate medical care for him and failed to ensure he was properly classified, housed, and monitored.

121.    Instead, Defendant Cooper made jokes and quipped that he would not mind releasing Mr. Long "just to cut our medical expenses."

122.    Defendants Cooper, Irvine, and Hammel failed to intervene to get Mr. Long medical attention or mental health care when this was brought to their attention—9 days before Mr. Long committed suicide.  Defendants Cooper, Irvine, and Hammel did not ask Defendant Vaught about the cause of Mr. Long's serious medical problems nor did they ask what Defendant Vaught intended to do to address those problems.

123.    Approximately 40 minutes after receiving the email from Defendant Hammel, Defendant Vaught saw Mr. Long for a virtual medical appointment and reviewed his medical records in preparation for the upcoming hearing.

124.    Mr. Long told Defendant Vaught that he had been experiencing episodes brought on by severe anxiety.

125.     Defendant Vaught recorded in Mr. Long's medical record that Mr. Long had anxiety disorder and had a history of bipolar disorder.

126.     Mr. Long requested mental care during his appointment with Defendant Vaught.

127.     Defendant Vaught wrote "refer to psych" in Mr. Long's medical records.

128.     Defendant Vaught released Mr. Long from medical watch.

129.     Defendant Vaught did not refer Mr. Long to a psychiatrist or take any action to get him seen by a mental health professional.

130.     On the afternoon of March 24, 2020, the Fremont County District Court held a hearing on the emergency motion for bond modification.

131.     That afternoon during the bond modification hearing, Mr. Dubois told the criminal court that the defense team was having trouble getting medical records or having any sort of conversation with medical staff at FCDC regarding Mr. Long's care.  Mr. Dubois stated that "we are frustrated at every turn" by the medical staff at FCDC (NatCore staff).  Mr. Dubious had asked the court to modify Mr. Long's bond to allow him to be released during the prosecution of his criminal case for Mr. Long's safety.

132.     Mr. Dubois called Defendant Vaught as a witness to testify regarding Mr. Long's condition and medical care.

133.     Defendant Vaught testified that when on medical watch, people incarcerated in FCDC are "essentially monitored 24 hours a day."

134.     This is untrue.  Individuals on medical watch at FCDC are not monitored 24 hours a day.

135.    Defendant Vaught testified that Mr. Long "certainly is bipolar.  That's what he told me today and I believe, I believe that.  And he also suffers from anxiety.  And he indicated to me today that he, he gets -- you know, he gets very anxious and he has, you know, and he calls them episodes."

136.    Defendant Vaught testified that Mr. Long had been placed on the list to see the psychiatrist.

137.    Defendant Vaught also testified that although he wanted Mr. Long to be seen by the psychiatrist a week before the hearing, he knew Mr. Long had not been seen.  Defendant Vaught said the "psychiatrist had to leave early and, you know, and you know, so forth."

138.    Defendant Vaught also testified that he spoke with Defendant Hammel and other unnamed Natcore medical staff who told him that Mr. Long had injured himself on video a few days prior.

139.    Thus, weeks after the first individual noted Mr. Long needed mental health treatment, many days after FCDC and NatCore staff reported self-injurious behavior, and 9 days before Mr. Long committed suicide, Defendant Vaught knew of Mr. Long's self-injurious behavior and need for immediate mental health care.

140.    Nonetheless, Defendant Vaught, the most senior medical authority at NatCore and in FCDC, failed to get Mr. Long mental health care before he killed himself over a week later.

141.    Similarly to Defendant Vaught, Defendants Cooper, Irvine, and Hammel knew of Mr. Long's self-injurious behavior.  They also knew that NatCore staff had not been cooperating with Mr. Long's defense team's inquiries about his medical condition and that NatCore staff had not been providing Mr. Long adequate medical care.  Despite this knowledge, Defendants

Cooper, Irvine, and Hammel failed to get Mr. Long mental health care, failed to classify him as a Special Management Inmate, and failed to put him on suicide watch.

142.     Defendant Vaught failed to get Mr. Long mental healthcare or to put Mr. Long on suicide watch.  Defendant Vaught's failure to put Mr. Long on suicide watch despite knowing about Mr. Long's documented self-injurious behavior violated FCDC's policy on suicide intervention and prevention.

143.     Defendant Vaught admitted that Mr. Long had not been seen by any physician while at the FCDC from February 2020 to the date of the hearing.

*March 27, 2020*

144.     On March 27, 2020—6 days before Mr. Long committed suicide—Mr. Long attempted to get an extra dose of his anxiety medication, but NatCore staff denied his request.

145.     NatCore staff did not provide him an appointment with a mental health professional despite the fact he was suffering from severe anxiety.

146.     Mr. Long complained to NatCore staff that they began treating him worse after he had complained to his defense attorney about their medical neglect, as reflected in his medical records.

147.     Mr. Long also wrote an email to a member of his defense team stating "i really need a neurologist look at my hewd [sic]."

148.     Also that same day, Defendant Irvine emailed the prosecutors on Mr. Long's criminal case to ask about how the bond modification hearing went.

149.     The deputy district attorney (DDA) told Defendant Irvine the motion for bond modification was denied.  The DDA said, "Just a thank you?  I thought you'd give me five bucks

[for successfully fighting the release of Mr. Long]."  Defendant Irvine gleefully replied "$5 cha

ching!"

*March 28, 2020*

150.    On March 28, 2020—5 days before Mr. Long committed suicide—Mr. Long

submitted a "kite" (i.e., a written request) stating that he tried to tell medical staff that he was

having anxiety issues but was having problems with NatCore staff.

151.    Later that day, FCDC Deputy Cortez documented that Mr. Long stood in the day

hall of his unit and "started screaming," "[h]is anger was focus [sic] on the control center and

anyone who was in it.  He banged on the window a couple of times, saying '[expletive].'"

*March 29, 2020*

152.    On March 29, 2020—4 days before Mr. Long committed suicide—Mr. Long told

NatCore staff that he was going to refuse all medications unless he was given twice as much

anxiety medication.

153.    No NatCore staff got Mr. Long mental healthcare despite his repeated requests for

more anxiety medication.

154.    On the evening of March 29, 2020, Mr. Long sent a "kite" to NatCore medical

staff at FCDC complaining that he was seeing dead people and begging to see a psychiatrist

immediately.  Mr. Long indicated he did not even know who he was.  He wrote: "i am and have

been seeing dead people when I wake up in my cell at night.  They aren't dangerous but knowing

they are not real is quite disturbing.  I need to see a psychiatrist asap.  I ave been diagnosed since

age 13 having ADD, BIPOLAR 1, AGROPHOBIA, MILD SCHIZOPHRENIA, and simce

Panama, PTSD...Thank you, Mr Long. I think so? [*sic*]"

155.    Defendant Alcorn, a NatCore staff member at FCDC, reviewed this kite on March 29, 2020, at 9:45 p.m.  Defendant Alcorn responded to the kite, telling Mr. Long the kite would be forwarded to mental health staff.

156.    Despite the response on the kite, Defendant Alcorn did not contact any mental health professional regarding this disturbing message and cry for help by Mr. Long.  And no other NatCore staff contacted any mental health professional based on this message.

157.    Defendant Alcorn did not record this concerning request from Mr. Long for mental health care in his medical progress notes or medical record.

158.    Neither Defendant Alcorn nor any other NatCore staff put Mr. Long on medical or suicide watch, nor did they classify him as a Special Management Inmate even after he pleaded to see the psychiatrist and complained of frightening hallucinations.

159.    Defendant Alcorn's failure to get Mr. Long urgent mental health care when he begged to see a psychiatrist and reported seeing hallucinations of dead people—after he had exhibited self-injurious behavior—violated FCDC policy and basic medical procedure.

*April 1, 2020*

160.    On April 1, 2020—1 day before Mr. Long committed suicide—after coughing and wheezing for two days, Mr. Long tested positive for strep throat.  FCDC officials moved him to the medical isolation unit, T Pod.

*April 2, 2020*

161.    On April 2, 2020, at 9:04 am, Mr. Long emailed a member of his criminal defense team with the subject line "HELP THEY ARE PUTTING EVERYONES

LIVESCATBDANGER HE" [sic].  Mr. Long complained about the medical care he was

receiving and pleaded for the team member to do all she could do to get him to a hospital.

162.    Mr. Long can be seen on the FCDC video pacing around the unit's dayroom,

looking distraught.

163.    At 10:01 am, Mr. Long tied a rope of cloth on the top corner of his top bunk.

164.    At 10:03 am, Mr. Long began writing a note on his top bunk.

165.    At 10:14 am, Mr. Long wrote on the back (inside) of his cell door, "GOD 4 give

ME."

166.    At 10:21 am, Mr. Long again emailed his defense team member.  The subject line

was "my mindnismgone and im sick" [sic].  Mr. Long stated "please dont be mad but ive begged

for mental health."

167.    Emails written by individuals incarcerated in FCDC are monitored by FCDC

staff, even emails to non-attorney defense team members, like those mentioned here.

168.    Individual cells in Mr. Long's pod can be viewed at any time by FCDC staff as

videos of the cells are broadcast to FCDC master control.

169.    At 10:22 am, Mr. Long stepped into his cell and closed the door.  He took off both

socks and tied them together.  Mr. Long then put the sock rope around his neck and tied the two

ends together around his neck, tightly.

170.    At 10:23 am, Mr. Long connected a rope he had made from cloth and tied to the

top of his bunk bed with the rope he had made around his neck.  Mr. Long dropped his legs out

from underneath himself.

171.     Video from the cell broadcast to FCDC master control shows Mr. Long struggling and kicking as he hangs from his bunk.  Mr. Long is in obvious pain and anguish.

172.     Mr. Long hung from his bunk, in clear view of the video camera of his cell, for 37 minutes before he was found.

173.     FCDC Deputy Murray was supposed to be monitoring the people incarcerated in T Pod, including Mr. Long, and failed to notice Mr. Long hanging on video for over 30 minutes.

174.     Deputy Murray only found Mr. Long because Deputy Murray noticed Mr. Long did not come out of his cell to receive his tray when Deputy Murray dropped off lunch to T Pod.

175.     Deputy Murray then looked into Mr. Long's cell to give him his lunch tray and finally noticed his lifeless body hanging from his bunk.

176.     Deputy Murray issued a call over his radio that Mr. Long had hung himself.  Then Deputy Murray and several other FCDC deputies made their way into Mr. Long's cell and cut him down.

177.     By the time the deputies cut Mr. Long down, he was blue in the face and not breathing.

178.     FCDC officials called emergency medical personnel from American Medical Response to respond to the emergency.  After American Medical Response personnel hooked Mr. Long up to medical equipment, they pronounced him deceased at 11:11 a.m.

179.     Mr. Long left a suicide note, which read in part, "I'm sorry...tell my mom & son I'm sorry...I'm tired of seeing dead people...I've begged and begged for help...to all jail staff, we are humans too!  No one has help[ed], tired of being laughed at."

180.    Mr. Long's family and attorneys have requested the complete video footage of Mr. Long's death.  FCDC has not provided all the footage.

181.    On information and belief, the complete footage of Mr. Long's death has been destroyed by FCDC and/or NatCore officials.

**D.      FCDC officials and NatCore staff repeatedly violated policies, which, if followed, could have saved Mr. Long's life.**

*Policy on Special Management Inmates*

182.    FCSO Policy 505 covers "Special Management Inmates."

183.    Policy 505 states that "[i]nmates who pose a heightened risk to themselves or others require special management, including frequent interaction and increased supervision by staff.  Interaction with Special Management Inmates is essential to maintaining a safe, secure and humane environment."

184.    Policy 505 says the following is a non-exhaustive list of individuals who may be classified as Special Management Inmates: "exhibiting mental health concerns," "a suicide risk," or "exhibiting medical issues."

185.    Policy 505 says "inmates who pose such a risk **must** be promptly and appropriately separated...until such time that they no longer pose a risk."  (Emphasis added.)

186.    Policy 505 lists "Circumstances Requiring Restrictive Housing."  Under this section, Policy 505 states the "Detention Division Commander – Captain or Shift Supervisor has the authority to immediately place any inmate into restrictive housing when it reasonably appears necessary to protect the inmate or others."  Policy 505 continues to list reasons an inmate may be placed into immediate restrictive housing, including if "[t]here is reason to believe the inmate poses a danger to him/herself or others," "[t]he inmate requires immediate mental health

evaluation and medical housing is not reasonably available," and "[o]ther circumstances where, in the judgment of the staff, the inmate may pose a threat to him/herself."

187.    Therefore, Mr. Long should have been classified a Special Management Inmate on March 19, 2020, when he first exhibited documented self-injurious behavior.

188.    Had he been classified as a Special Management Inmate he would have, by policy, been required to be provided, *inter alia*:

- "frequent interaction and increased supervision by staff,"

- a daily visit by medical staff,

- weekly mental health evaluations,

- a screening within three days by a qualified health care professional for suicide risk,

- "increased monitoring to include, at a minimum...a daily visit by the Detention Division Commander – Captain or the authorized designee...," and

- **face-to-face safety checks at least every 15 minutes**.

189.    Under Policy 505, Special Management Inmates who are at risk of suicide shall be under continuous observation until seen by a qualified health care professional.

**505.9   SAFETY CHECKS**

A staff member shall conduct a face-to-face safety check of all special management inmates, including those assigned to restrictive housing or protective custody, at least every 30 minutes on an irregular schedule. Inmates who are violent, have mental health problems or demonstrate behavior that is easily identified as out of the ordinary or bizarre in nature should be personally observed by the staff every 15 minutes on an irregular schedule.

Inmates who are at risk of suicide shall be under continuous observation until seen by a qualified health care professional. Subsequent supervision routines should be in accordance with orders provided by the qualified health care professional.

Special management inmates shall receive increased monitoring to include, at a minimum:

    (a)    A daily visit by the Detention Division Commander - Captain or the authorized designee.

    (b)    Visits by members of the program staff, upon request.

All management, program staff and qualified health care professional visits shall be documented in the appropriate records and logs and retained in accordance with established records retention schedules.

190.    According to Mr. Long's cell assignment history, the following FCDC deputies failed to appropriately classify Mr. Long as a Special Management Inmate after March 19, 2020: John McDonald, Charlene Combs, Emily Piper, Jay Cantrell, and Chad Curtis.

191.    Lieutenant Perez and Deputy Murray, both of whom were on duty at the time of Mr. Long's suicide, also failed to follow Policy 505 and classify Mr. Long as a Special Management Inmate after March 19, 2020 (when he first exhibited self-injurious behavior).

192.    Medical watch is entirely different from suicide watch or the observations required under the special management.  Under the Special Management Inmate observation protocols, incarcerated people with mental health problems, including those who demonstrate behavior that is easily identified as out of the ordinary or bizarre in nature, should be personally observed by staff every 15 minutes on an irregular schedule.  Moreover, under the special

management observation protocols, incarcerated people who are at risk of suicide must be under continuous observation until seen by a qualified health care professional.  Under FCDC's suicide prevention and intervention policy, people on suicide watch are subject to continuous visual observation until evaluated by a mental health professional and are placed in a cell designed to be suicide-resistant.  And under FCDC's suicide prevention and intervention policy, people on suicide watch are to be observed no less than every 15 minutes.

*Policy on Standard of Care*

193.    FCSO Policy 702 covers "Availability and Standards of Care."

194.    Policy 702 mandates that officials "shall refer any inmate showing signs of mental health disorder or a developmental disability to a care liaison, who will arrange for an appropriate referral."

195.    No FCDC official or NatCore staff member, including any Defendants, arranged for Mr. Long to receive treatment by a qualified mental-health professional.

196.    Policy 702 states that the following mental health care will be provided to inmates, inter alia: counseling and crisis intervention, management of acute psychiatric episodes, stabilization and treatment of mental disorders, and medication support services.

197.    As noted, Defendants did not provide Mr. Long with this mental health care.

*Policy on Inmate Screening and Evaluations*

198.    FCSO Policy 701 covers "Inmate Screening and Evaluations."

199.    Policy 701 mandates that the responsible physician—here Defendant Vaught—should review any evaluations conducted by other health care professionals.

200.     Here, as noted above, Defendant Vaught did not review Mr. Long's March 1, 2020 mental health screening, nor did any other provider.

*Policy on Suicide Prevention*

201.     FCSO Policy 707 covers "Suicide Prevention and Intervention."

202.     Policy 707 mandates that any official who identifies an inmate who displays suicidal signs shall immediately notify a supervisor and a health care liaison.  Policy 707 also mandates that the inmate shall be personally monitored until a mental health professional approves another form of monitoring.

203.     Here, Mr. Long exhibited self-injurious behavior as early as March 19, 2020. Defendants never put him on suicide watch.  Defendants never personally monitored Mr. Long. Defendants never allowed Mr. Long to be seen by a mental-health professional.

204.     Policy 707 provides that incarcerated people with a recent history of self-injurious behavior should be placed on suicide watch.

205.     Despite his recorded self-injury, Defendants Vaught and Beaty did not put Mr. Long on suicide watch.

206.     Policy 707 states that incarcerated people placed on suicide watch shall be housed in a cell that is suicide resistant, and the person shall be subject to continuous direct visual observation until the person is evaluated by a mental health professional.

207.     Instead of placing Mr. Long on suicide watch in accordance with Policy 707, FCDC officials instead placed Mr. Long in cells that were not suicide resistant, and they failed to continuously observe him despite the fact he never saw a mental health professional.

208.    Policy 707 states that incarcerated people on suicide watch shall be placed on a 15-minute watch interval with each observation documented.

209.    Defendants never placed Mr. Long under a 15-minute watch interval.

210.    Policy 707 states that the shift supervisor and the responsible physician (or their authorized designees) must observe the inmate at least once every five hours and record it in an observation log.

211.    Here, the shift supervisor the morning Mr. Long committed suicide, Lt. Perez, and the responsible physician, Defendant Vaught, failed to personally observe Mr. Long every five hours.

212.    Policy 707 mandates that the health care advisor—here, on information and belief, Defendant Vaught—and the Detention Captain—Carrie Hammel, are responsible for developing a suicide prevention plan that addresses, inter alia, initial screening and follow-up assessments, referrals to mental health care providers, training, and monitoring inmates at risk for suicide.

213.    Defendants Cooper, Vaught, and Hammel, did not have a process to get incarcerated people in crisis in contact with mental health professionals promptly.

214.    On information and belief, as operations lieutenant, Lt. Perez was responsible for overseeing the medical care of incarcerated people at FCDC.

215.    On information and belief, as captain, Defendant Hammel was also responsible for overseeing the medical care of incarcerated people at FCDC.  Defendant Hammel was also responsible for training and supervision of FCDC staff and implementing policies to protect people incarcerated at FCDC.

E.    **NatCore has a pattern and practice of providing sub-standard care like Mr. Long received.**

216.    NatCore has a pattern and practice of providing inadequate medical care to the incarcerated people in its care and failing to ensure adequate staffing necessary for the wellbeing of the individuals in its care.

217.    For example, in July 2017, Fremont County officials arrested Scott Beseau and detained him at the FCDC.  At that time, Mr. Beseau had no cognitive memory problems, had no seizure disorder, and had no known medical condition that would cause seizures.  While in custody, Mr. Beseau suffered a series of seizures, but no FCDC officials nor NatCore staff members took him to a hospital for treatment or for appropriate diagnosis and care.  Instead, FCDC officials and NatCore staff did nothing to evaluate the cause of the seizures.

218.    FCDC and NatCore released Mr. Beseau in a highly impaired and disoriented state after he soiled himself because of an inability to control his bladder during one of his seizures.  FCDC and NatCore released Mr. Beseau in a wheelchair to his wife.  Upon release, Mr. Beseau could not stand to get in the car.  Later hospitalized, he still suffers from the effects of the inadequate care.

219.    Defendant Vaught, the CEO of NatCore, acted as a final policymaker in the failure to provide medical care for Mr. Long.

220.    No other NatCore staff member reviewed Defendant Vaught's decisions with respect to the medical care provided, or not provided, to Mr. Long.

221.    On information and belief, Defendant Vaught is responsible for coordinating mental health care appointments for FCDC inmates.

222.    Defendant Vaught did not seek a mental health care appointment for Mr. Long, despite his testimony under oath that Mr. Long needed mental health care and was on the list to see a psychiatrist.

223.    No one ever put Mr. Long on any list for mental health care.

224.    And even if Defendant Vaught did put Mr. Long on a list to see a psychiatrist, as the responsible physician, Defendant Vaught was obligated to get Mr. Long prompt care from another source if necessary when Defendant Vaught became aware of Mr. Long's self-injurious behavior and mental health issues.

225.    Defendants Vaught and NatCore subcontracted with only one mental health professional, who also worked at least one other job, to provide care part time.

226.    On April 1, 2020, FCDC incarcerated 130 individuals.

227.    Defendant Vaught ran NatCore and knew that in at least 2020 NatCore provided the required medical coverage for FCDC only 74% of the time.

228.    Defendants Vaught and NatCore could have hired more officials to provide people incarcerated in FCDC mental health care but chose such sparse staffing to save money.

**F.    Fremont County has a pattern and practice of providing inadequate oversight of the medical care at FCDC.**

229.    All of the above-mentioned problems by NatCore happened in the FCDC yet Fremont County continued to contract with NatCore.

230.    As noted, Fremont County did absolutely no due diligence to ensure that NatCore would provide adequate medical care for the people incarcerated at the FCDC prior to contracting with them.

231.    Fremont County conducted no official audits or reviews of the healthcare being provided by NatCore during the three years it contracted with the company.

232.    Fremont County renewed the contract with NatCore without considering other providers from 2017 until the end of 2020.

233.    The BOCC did not even review and approve the contract with NatCore to provide medical care to FCDC inmates from January 1-December 30, 2020, until May 2020, after Mr. Long had committed suicide.

234.    But on May 26, 2020—six weeks after Mr. Long's suicide—the BOCC approved an agreement with NatCore to provide medical care to people incarcerated at FCDC until the end of December 2020.  The agreement was approved by consent agenda, there was no discussion about the staff shortages or any other aspect of the agreement of NatCore's performance.

235.    The only oversight the BOCC exercised over the FCDC or NatCore involved a once yearly "walk through," where it did not even make any record of the review, findings, or recommendations.

236.    The BOCC did not perform any audit or review of the contract compliance by NatCore during its three-year contract to provide care to people incarcerated in FCDC.

237.    Eventually, in November 2020, Defendant Cooper told Defendant Vaught that he knew of the hiring and retention struggles Defendant Vaught had, noting that those struggles "ha[ve] negatively impacted our medical coverage" at FCDC.

238.    Defendant Cooper noted that NatCore was short staffed 74% of the time. Defendant Cooper informed Defendant Vaught he would not renew the contract with NatCore for 2021.

239.     Fremont County deliberately did not seek outside accreditation of its medical care, as many jails in Colorado do to ensure quality of care.

240.     Moreover, even before contracting with NatCore, Fremont County had a pattern of providing inadequate medical and mental healthcare for people incarcerated in FCDC.

241.     For example, in August 2016, Fremont County officials arrested a man named Stephen Garrett, and he informed FCDC officials of his depression and suicidal ideation that developed into a mental health crisis.  In November 2016, Mr. Garrett told an FCDC employee that he was "seriously and imminently contemplating suicide," and she responded "I wish you would f****** kill yourself."  Hours later, Mr. Garrett used a razor to slice open his left arm, cutting his radial artery and causing significant blood loss.

242.     When Mr. Garrett returned from the hospital where medical providers sutured his wounds, FCDC staff members placed him in solitary confinement.  FCDC officials provided him no mental health care.  And, foreseeably, later that day Mr. Garrett removed his bandages and tried to reopen his wounds, further injuring himself, requiring another trip to the hospital.

243.     The next day, when Mr. Garrett returned to FCDC, FCDC personnel placed him in a restraint chair with straps across his legs, chest, and arms, and also used special gloves and metal handcuffs on him.

244.     Mr. Garrett remained in various forms of bodily restraint for **28 days.**

245.     Mr. Garrett remained in the gloves for so long that his skin molted when FCDC staff finally removed the gloves.  Mr. Garrett vomited food and aspirated it while he was restrained.

246.    At FCDC, Mr. Garrett received no actual mental health treatment, ultimately leading to his transfer to the Colorado Mental Health Institute (CMHI) in connection with his criminal case, where he got much better.

247.    Once stabilized, CMHI officials transferred Mr. Garrett back to FCDC.  FCDC officials again returned him to solitary confinement, where he began to deteriorate.

248.    The actions by FCDC officials in response to Mr. Garrett's mental health crisis represent a significant departure from the basic health care needs of an individual in a mental health crisis.

249.    In 2014, Fremont County officials received a report that Carolyn O'Neal might be suicidal as she had just learned that her mother was dying.  After the officials dispatched to Ms. O'Neal's room at a residential rehabilitation facility for people with addictions, she refused to grant the deputies permission to enter her room.  Nonetheless, Fremont County police arrested Ms. O'Neal, dragged her out of her room naked, and took her to FCDC over her protestations. Fremont County officials charged Ms. O'Neal with resisting arrest and disorderly conduct at the time of the incident, but a Fremont County judge dropped all charges after finding that the officers did not have probable cause to arrest her.  While she was at the FCDC, FCDC staff— including Defendant Hammel, then a sergeant who has since been promoted—allowed her to be nakedly exhibited in view of other individuals incarcerated at the FCDC, restrained her in a restraint chair naked, and even used a stun gun and a painful pressure technique on her during her mental health crisis.

250.     In 2019, a jury heard Ms. O'Neal's civil-rights lawsuit against Defendants Fremont County, Hammel, and several other deputies, and awarded Ms. O'Neal $2.9 million for her horrifying encounter with Fremont County officials.

251.     And also in 2014, Fremont County officials arrested John Patrick Walter and detained him in the FCDC.  The FCDC lacked the presence of a nurse or medical providers for approximately 12 hours a day.  FCDC officials and medical staff forced Mr. Walter to quit his benzodiazepine medication cold-turkey upon his booking.  Mr. Walter quickly descended into a severe benzodiazepine withdrawal, which included gastrointestinal distress, lack of appetite and dramatic weight loss, incontinence, confusion, disorientation as to time and place, bizarre behavior, severe anxiety and panic, rapid mood swings, extreme restlessness and agitation, profound insomnia, delusional thinking, paranoia, hallucinations, delirium, tremors, twitching, incontrollable shaking, and seizures.

252.     FCDC officials knew of Mr. Walter's deterioration, and two weeks into his withdrawal, they moved him into a single cell in a pod by himself because he was disrupting other incarcerated people with his insomnia.

253.     Shortly thereafter, as Mr. Walter's withdrawal had culminated into a mental health crisis where he experienced delirium and hallucinations, FCDC officials repeatedly used extreme and objectively unreasonable force on Mr. Walter, including pepper spraying him, shocking him with a Taser, forcibly strapping him into a restraint chair (on at least two separate occasions), and using multiple forms of hands-on physical force—including pressure points, joint locks, and other pain compliance techniques—as well as severe physical beatings that caused subcutaneous contusions, numerous broken bones, and internal bleeding.

254.    While only some FCDC officials took part in the abuse, other FCDC officials failed to intervene in these attacks.

255.    From April 15-20, 2014, FCDC officials detained Mr. Walter in a holding cell in the FCDC booking area.  During that time period, he did not sleep and barely ate, and FCDC officials gave him very little, if any, water to drink.  Mr. Walter grew weaker and weaker, clearly suffering from severe malnutrition, extreme calorie deficit, and dehydration.  During his 18-day confinement, Mr. Walters lost more than 30 pounds.  Mr. Walter grew incontinent and lost bowel and bladder control, causing him to defecate and urinate on himself or in his surroundings and his single cell to smell even to hallway observers.

256.    During this time, Defendant Hammel personally interacted with Mr. Walter but failed to intervene and get him medical care.  Moreover,  Defendant Hammel had supervisory responsibilities over other FCDC personnel during this time and ratified their conduct with respect to Mr. Walter.

257.    For days, FCDC officials watched Mr. Walter experience this medical crisis, and saw him regularly pacing in his cell, "rolling around on the floor and yelling," repeatedly removing his clothing at times, writhing on the cold floor, naked, and they knew he was actively hallucinating and delusional.

258.    On April 20, 2014, FCDC personnel found Mr. Walter dead, naked on the floor of his cell, after he spent the day lying on the ground in a fetal position and shaking, unable to sit up on his own.

259.     Fremont County had failed to provide training on managing and responding to

detainees who are in a mental health crisis in 2014, and it has continued that failure through at

least 2020.

**G.     Fremont County and NatCore, and their employees, are aware of the high risk of suicide in the jail environment.**

260.     People incarcerated in jails are five times more likely than the general population

to have a serious mental illness.[1]

261.     The Department of Justice data from 2016 (the most up to date data available)

show that suicide remains the leading cause of death in local jails like FCDC, accounting for

31% of deaths in those incarcerated in local jails in 2016.[2]

262.     The jail suicide rate is far higher than that of the American population generally

and even those in state prisons.[3]

263.     As the Department of Justice concluded in its 2010 National Study of Jail Suicide,

"certain features of the jail environment enhance suicidal behavior: fear of the unknown, distrust

of an authoritarian environment, perceived lack of control over the future, isolation from family

and significant others, shame of incarceration, and perceived dehumanizing aspects of

incarceration."[4]

---

[1] *See* https://www.prisonpolicy.org/blog/2020/02/13/jaildeaths/.
[2] *See* Carson, et al., *Mortality in Local Jails, 2000-2016 - Statistical Tables*, Bureau of Justice Statistics (February 2020), available at https://www.bjs.gov/content/pub/pdf/mlj0016st.pdf?utm_content=mci&utm_medium=email&utm_source=govdelivery (last accessed March 14, 2021).
[3] *See* https://www.prisonpolicy.org/blog/2020/02/13/jaildeaths/.
[4] *See* https://s3.amazonaws.com/static.nicic.gov/Library/024308.pdf.

264.    Individuals who work in jail facilities—including individuals working in FCDC—are aware that given the jail environment and the particular mental-health needs of individuals who are incarcerated, there is a high risk of suicide for those incarcerated in local jails.

265.    Defendants were aware of the unique and high risk of suicide of those incarcerated at FCDC.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1983 — Deliberate Indifference to Serious Medical Needs**
**Violation of the Fourteenth Amendment Due Process Clause**
**(by Plaintiff Estate against Defendants Vaught, Cooper (in his individual capacity), Irvine,**
**Hammel, Beaty, and Alcorn)**

266.    The Estate incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

267.    The Estate brings this claim against Defendants Vaught, Beaty, and Alcorn (medical-provider Defendants) and Defendants Cooper (in his individual capacity), Irvine, Hammel (FCSO Defendants).

268.    At all times relevant to this claim, the Defendants were acting under the color of state law.

269.    Clint Long was a pretrial detainee.

270.    The medical-provider Defendants actually knew about Mr. Long's serious medical needs—including his self-injurious behavior and the many red flags indicating that he was at risk of additional self-harm—and, with deliberate indifference to those needs, failed to provide him the appropriate medical care and failed to appropriately classify and house him to ensure his safety.  The medical-provider Defendants failed to provide him the urgent mental-

health care that he begged for and that FCDC policy mandated he receive.  They did so even though they were aware of Mr. Long's known serious medical needs, recklessly disregarding a substantial risk of physical harm and death to Mr. Long.

271.    Defendant Alcorn knew about Mr. Long's self-harm, disturbing hallucinations, his failure to receive mental health care, and his urgent request for mental-health care but failed to obtain mental-health care for Mr. Long and failed to properly classify, house, and observe Mr. Long, who was mentally ill and in an obvious mental-health crisis.

272.    The medical-provider Defendants continued to act in bad faith and with deliberate indifference to Mr. Long's serious medical needs and constitutional rights when they willfully ignored his repeated requests for mental health care, intentionally denied his access to a mental health professional, and deliberately failed to classify and house him appropriately.

273.    The medical-provider Defendants failed to provide him the urgent mental health care that he begged for and that FCDC policy mandated he receive.  They did so despite being expressly aware of Mr. Long's known serious medical needs, recklessly disregarding a substantial risk of physical harm and death to Mr. Long.

274.    Defendant Vaught had personal knowledge of Mr. Long's serious medical needs—including his self-injurious behavior and his many red-flags indicating he was at risk of additional self-harm—and the fact that his medical staff within FCDC was failing to adequately treat Mr. Long and, with deliberate indifference to those needs, failed to get Mr. Long seen by any mental health care professional.  Defendant Vaught was responsible for coordinating mental health care for people incarcerated at FCDC and was aware of the dire staff shortages he caused.

Defendant Vaught knew of the significant risk of suicide in the jail environment but failed to ensure adequate mental health care for people incarcerated at the FCDC.

275.    The FCSO Defendants knew about Mr. Long's serious medical needs—including his self-injurious behavior and the many red flags indicating he was at risk of additional self-harm—and the fact that medical staff within FCDC were failing to provide adequately medical treatment to Mr. Long and, with deliberate indifference to those needs, failed to ensure he was provided the appropriate medical care and failed to appropriately classify and house him to ensure his safety. The FCSO Defendants knew that Mr. Long was self-harming and was not receiving adequate medical care from NatCore staff but failed to intervene to obtain mental-health care for him and failed to follow FCDC policy regarding his classification and housing with deliberate indifference to the substantial risk of physical harm and death to Mr. Long.

276.    The acts or omissions of these Defendants as described herein intentionally deprived Mr. Long of his constitutional rights and were moving forces and substantial, significant, contributing, legal, and proximate causes of Mr. Long's injuries and death.

277.    As a direct result of these Defendants' unlawful conduct, Mr. Long suffered extreme mental pain and suffering for days, including the violent pain and trauma he experienced at the moments of his death, which entitle him to compensatory damages and attorneys' fees in amounts to be determined at trial.

278.    As a proximate cause of these Defendants' unlawful conduct, the Estate has suffered injuries and losses, including the death of Mr. Long, entitling it to recover his compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, and his herein described terrifying pain and suffering during and leading up to this fatal

event, permanent lost earnings and earnings capacity for the working lifetime of Mr. Long, and

other special damages, all in amounts to be proven at trial.

279.    The acts or omissions of the Defendants as described herein were taken

maliciously, willfully, or with a reckless or wanton disregard of Mr. Long's constitutional rights,

and Plaintiff is entitled to punitive damages against these Defendants in addition to

compensatory, economic, consequential, and special damages.

280.    Plaintiff Estate is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §

1988 and to pre-judgment interest and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — Failure to Provide Adequate Medical Care / Failure to Train &**
**Supervise / Deliberately Indifferent Hiring**
***Monell* Claim**
**(by Plaintiff Estate against Defendants Cooper (in his official capacity) and the Board of**
**County Commissioners for the County of Fremont)**

281.    The Estate incorporates by reference the foregoing paragraphs of this Complaint

as if set forth fully herein.

282.    The Estate brings this claim against Defendants Cooper (in his official capacity)

and the Board of County Commissioners for the County of Fremont (collectively, Fremont

County).

283.    At all times relevant to this Complaint, Fremont County was acting under the

color of state law.

284.    At all times relevant to this Complaint, Fremont County had a non-delegable duty

under the U.S. Constitution to provide adequate medical care to its jail population.

285.    Fremont County exhibited a policy, practice, and custom of deliberately

indifferent hiring practices to save costs and enrich its friends when it contracted with NatCore

despite failing to do any reasonable diligence to determine whether the company could provide adequate medical care, whether the company's leadership had the experience and competence to lead an entire team in providing medical and mental health care to a highly vulnerable population, whether the company could provide adequate mental health treatment, and whether the company had the staffing to meet the needs of the FCDC, despite knowing of the company's hasty creation, nepotistic placement as the vendor, and ongoing staffing shortages.   And before its deliberately indifferent hiring of NatCore, Fremont County had hired Correct Care Solutions (CCS), despite knowing about CCS's history of causing serious injury and death to dozens of individuals around the country, including in Colorado.  And Fremont County continued its contract with CCS even after it provided inadequate medical care at FCDC, as described herein.

286.    Fremont County also exhibited a policy, practice, and custom of failing to exercise any oversight over its private medical contractor to ensure the well being of the people incarcerated at FCDC.  Despite its knowledge that individuals in a jail environment are more likely than other populations to suffer from serious medical and mental health problems, Fremont County failed to do any formal reviews or audits of the private medical contractor, Fremont County made no recommendations to the private medical contractor, and the BOCC merely conducted a walk-through of FCDC once a year and rubber-stamped the approval of the County's contracts with Fremont County without any public discussion of the agreement or NatCore's performance under the agreement.  Fremont County failed to monitor contract compliance by NatCore for three years.

287.    Fremont County's failure to properly supervise NatCore was a moving force behind Mr. Long's inability to receive mental health care, his lack of proper classification and

housing, and his unattended and unobserved state, which afforded him an essentially unfettered ability to harm himself after he had done so previously.

288.     Fremont County exhibited a policy, practice, and custom of deliberately indifferent medical care in FCDC and deliberately indifferent training of FCDC employees to ensure people incarcerated at FCDC are provided adequate medical care as illustrated by:

a)  the misconduct described regarding Ms. O'Neal, Mr. Walters, and Mr. Garrett;

b)  FCDC employees' failure in 2019 to take Mr. Long to the hospital when he was puking blood or bleeding from his face, instead merely leaving a voicemail for NatCore staff because no NatCore medical personnel were working at the FCDC at the time;

c)  FCDC employees' repeated failure to check on Mr. Long as required when he was on medical watch in 2020;

d)  in March 2020, FCDC Deputy Mabbitt's failure to obtain medical care for Mr. Long when he asked to speak with a commanding officer about his medical concerns;

e)  later in March 2020, FCDC Deputy Murillo's failure to get Mr. Long medical care or to classify him as Special Management Inmate after Mr. Long told him it felt like someone was pouring hot water on his brain; FCDC employees', along with NatCore personnel's, failure to act to obtain mental-health care for Mr. Long or to classify and properly house him for his safety, despite their collective belief that Mr. Long was self-injuring in March 2020;

f)  FCDC Deputy Nish's failure, 10 days before Mr. Long committed suicide, to obtain medical care for him or to classify him as a Special Management Inmate after Mr.

Long told him he was having "mental issues" (when instead Deputy Nish told him there wasn't anything else he could do for Mr. Long);

g)  days before Mr. Long committed suicide, FCDC employees Braxton Buffington, Billie Clark, and Defendant Hammel's failure to ensure Mr. Long received mental-health care and failure to properly classify and house him for his safety, even after being made aware of Mr. Long's attorney's emergency motion for Mr. Long to be released given his medical condition and inadequate medical care;

h)  Defendants Cooper's, Irvine's, and Hammel's failure to ensure Mr. Long received mental health care or proper classification and housing, despite knowing that Mr. Long was self-injurious and receiving inadequate medical and mental-health care; and

i)  FCDC Deputy Murray's failure to take the most basic of care to oversee T Pod and notice Mr. Long's body hanging before more than 30 minutes had passed.

These FCDC staff knew of Mr. Long's mental illness and were deliberately indifferent to the serious emotional and physical harm that could have, and did, result from his untreated illness.

289.    Fremont County knew that individuals in its jail could suffer serious consequences by the continued implementation of these policies and practices, but maintained them anyway.

290.    Given the prevalence of individuals with severe medical conditions and mental-health needs within jails and the likelihood that failure to properly treat or recognize conditions would result in injury or death, Fremont County's failure to supervise NatCore, failure to train its staff, and failure to provide adequate medical care constitutes deliberate indifference because it is

highly likely, foreseeable, and obvious that such failures will result in constitutional violations. The failure to train FCDC staff was a moving force behind Mr. Long's inability to receive mental-health care, the fact that he was never properly classified or housed, and the fact that he was left unattended and unobserved with essentially unfettered ability to harm himself after he had done so previously.

291.    Fremont County, through policy makers and final delegated decision-makers, including Defendants Cooper, Irvine, and Hammel, ratified their employees' and subordinates' unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of ignoring serious medical conditions of people incarcerated at the FCDC, in part to save money, condoning systemic medical staffing shortages, and failing to properly house, classify, and observe people incarcerated at FCDC.  Moreover, final delegated decision-makers were personally aware of the lack of treatment provided to Mr. Long and his self-harming behaviors but refused to ensure he was provided care and properly classified, housed, and observed.

292.    Fremont County's policies, practices, habits, customs, widespread usages, and lack of training and supervision that resulted in the failure to provide proper medical care to treat Mr. Long's known serious medical needs and resulted in the failure to have Mr. Long properly classified, housed, and observed were not rationally related to a legitimate nonpunitive governmental purpose, or were excessive in relation to that purpose.

293.    As a proximate result of Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Mr. Long, entitling it to recover his compensatory and special damages, including for loss of constitutional rights, loss of enjoyment

of life, and his herein described terrifying pain and suffering during and leading up to this fatal

event, permanent lost earnings and earnings capacity for the expected productive working

lifetime of Mr. Long and other special damages, all in amounts to be proven at trial.

294.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and

pre- and post-judgment interest and costs as allowable by federal law.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — Failure to Provide Adequate Medical Care / Failure to**
**Train & Supervise**
***Monell* Claim**
**(by Plaintiff Estate against Defendant NatCore)**

295.     The Estate incorporates by reference the foregoing paragraphs of this Complaint

as if set forth fully herein.

296.     The Estate brings this claim against Defendant NatCore.

297.     At all times relevant to this Complaint, NatCore was acting under the color of

state law.

298.     NatCore exhibited a policy, practice, and custom of deliberately indifferent

medical care in FCDC and inadequate staffing as illustrated by:

   a)   NatCore's failure to provide Mr. Beseau with appropriate diagnostic care and

        medical observation; systemic staffing shortages as early as 2019 that affected

        FCDC's officials' ability to care for Mr. Long during medical crisis;

   b)   failure to have Mr. Long's February 2020 pre-admission medical screen (where he

        skipped the question regarding mental-health care) reviewed by a physician;

   c)   failure to have Mr. Long's March 2020 mental health assessment (which called for a

        mental health referral) reviewed by a physician;

d)  failure to provide Mr. Long care from any mental-health professional despite repeated red flags for suicide and severe mental illness from February 2020 until he died in April 2020;

e)  failure of NatCore staff to adequately observe Mr. Long while he was on medical watch;

f)  Defendant Beaty's acknowledgement that Mr. Long was self-harming weeks before his suicide and Defendant Beaty's failure to get him mental health care or to properly classify, house, and observe him as a self-harming individual;

g)  a NatCore employee willful disregard of Mr. Long's complaint that he was "losing his mind" 12 days before his suicide and failure to get him mental health care or to properly classify, house, or observe him;

h)  Defendant Vaught's acknowledgment 12 days before Mr. Long committed suicide that Mr. Long was self-harming and his complete failure to get him mental health treatment or to properly classify, house, or observe him;

i)  Defendant Vaught's failure to get Mr. Long mental health care despite the fact he was called into court 9 days before Mr. Long's suicide to discuss his deteriorating condition and had an appointment with Mr. Long where he begged for mental health care;

j)  NatCore's staff's refusal to provide Mr. Long's defense team information Mr. Long requested they provide regarding his medical condition;

k)  the disregard of Mr. Long's request 5 days before his suicide that he was having anxiety problems but NatCore staff weren't helping;

l) failure to provide Mr. Long mental health care 4 days before his suicide when he demanded more anxiety medication; and Defendant Alcorn's failure to take any action when—4 days before his suicide—Mr. Long submitted a kite saying he was having hallucinations of dead people and begging to see a psychiatrist.

299.    NatCore knew that individuals in FCDC could suffer serious consequences by the continued implementation of these policies and practices but maintained them anyway.

300.    Given the prevalence of individuals with severe health conditions and mental-health needs within jails and the likelihood that failure to properly treat or recognize conditions would result in injury or death, NatCore's failure to train its staff to recognize people suffering from problems with mental illness, provide mental health care to individuals in crisis, failure to maintain adequate medical staffing—including mental health care staff—and failure to properly classify, house, and observe individuals at FCDC constitutes deliberate indifference because it is highly likely, foreseeable, and obvious that such failures will result in constitutional violations. These failures were a moving force behind Mr. Long's inability to receive mental health care, the fact that he was never properly classified or housed, and the fact that he was left unattended and unobserved with essentially unfettered ability to harm himself after he had done so previously.

301.    NatCore through policy makers and final delegated decision-makers, ratified its employees' and subordinates' unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of ignoring serious medical conditions of people incarcerated at the FCDC, in part to save money, allowing systemic medical staffing shortages, including shortages of mental health care staff, and failing to properly house, classify, and observe people incarcerated at FCDC.  Moreover, final delegated decision-

makers were personally aware of the lack of treatment provided to Mr. Long and his self-harming behaviors but refused to ensure he was provided care and properly classified, housed, and observed.

302.    NatCore's policies, practices, habits, customs, widespread usages, and lack of training and supervision that resulted in the failure to provide proper medical care to treat Mr. Long's known serious medical needs and resulted in the failure to have Mr. Long properly classified, housed, and observed were not rationally related to a legitimate nonpunitive governmental purpose, or were excessive in relation to that purpose.

303.    As a proximate result of Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Mr. Long, entitling it to recover his compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, and his herein described terrifying pain and suffering during and leading up to this fatal event, permanent lost earnings and earnings capacity for the expected productive working lifetime of Mr. Long and other special damages, all in amounts to be proven at trial.

304.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and pre- and post-judgment interest and costs as allowable by federal law.

**FOURTH CLAIM FOR RELIEF**
**Negligence in the Operation of a Jail Causing Wrongful Death**
**(by Plaintiff Gage Long against Defendants Cooper (in his official capacity)  and the Board of County Commissioners for the County of Fremont)**

305.    Plaintiff Gage Long incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

306.    Plaintiff Gage Long brings this claim against Defendants Cooper (in his official capacity) and the Board of County Commissioners for the County of Fremont (collectively Fremont County).

307.    Pursuant to the Colorado Governmental Immunity Act (CGIA), Colo. Rev. Stat. § 24-10-106, governmental immunity is waived for any action by a pre-trial detainee for injuries, which lie in tort or could lie in tort, resulting from the negligent operation of any correctional facility or jail.

308.    Plaintiff provided timely notice of claims under Colo. Rev. Stat. § 24-10-109.

309.    At all times relevant to this Complaint, Mr. Long was incarcerated at FCDC as a pre-trial detainee.

310.    Fremont County is vicariously liable for the negligent acts and omissions by its agents and/or employees, including but not limited to, Defendant Hammel, Lt. Perez, Sergeant Clark, Deputies Mabbitt, Glab, Murillo, Wicklund, Hiles, Breeding, Curtis, Nish, Buffington, Cortez, Murray, and other officials, who were acting in the scope of their employment.

311.    At all times relevant to this action, Mr. Long was in the custody and care of FCDC staff.

312.    The operation of a correctional facility for purposes of the CGIA includes adequate provision of medical and mental-health care necessary for basic health, and adequate provision of protection from self-harm.

313.    The Fremont County Defendants had a duty to provide reasonable care to prevent incarcerated people known to be at risk for suicide from killing themselves, a duty to properly

classify such detainees and house them accordingly, and a duty to properly supervise and monitor these detainees at risk of self-harm.

314.     As alleged herein, the Fremont County Defendants breached these duties by their negligent acts and omissions, including, but not limited to, the following:

a)   Failing to properly classify and house Mr. Long after his self-injurious behavior, including Defendant Hammel's (and others') failure to require Mr. Long to be classified as a Special Management Inmate and to require Mr. Long to be put on suicide watch given her personal knowledge that Mr. Long was self-injurious and not receiving proper medical care;

b)   Failing to adequately supervise and monitor Mr. Long in his cell;

c)   Failing to exercise reasonable care in the training and supervision of its employees, including training regarding recognizing the well-known red flags indicating a suicidal detainee, and in acting to place such a suicidal detainee in an incarceration setting where he could not act out his suicidal impulses;

d)   Failing to exercise reasonable care in hiring a private medical contractor to provide medical and mental health care to people incarcerated at FCDC; and

e)   Failure to exercise reasonable care in supervising a private medical contractor to provide medical and mental health care to people incarcerated at FCDC.

315.     As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff Gage Long has suffered damages, losses and injuries in an amount to be determined by the jury at trial.  These damages include, *inter alia,* funeral expenses, lost earnings and financial benefits he would have reasonably been expected to receive from his father had he

lived, pain and suffering, upset, grief, loss of his father's companionship, anger, and all other damages as allowed under state law.

## FIFTH CLAIM FOR RELIEF
### Negligence Resulting in Wrongful Death
### (by Plaintiff Gage Long against Defendants NatCore, Vaught, Beaty, and Alcorn)

316.    Plaintiff Gage Long incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

317.    Plaintiff Gage Long brings this claim against Defendants NatCore, Vaught, Beaty, and Alcorn.

318.    NatCore is a private corporation that contracted with Fremont County to provide medical care and health services to people incarcerated at FCDC.

319.    NatCore is vicariously liable for the negligent acts and omissions by its agent and/or employees, including but not limited to, Defendants Vaught, Beaty, and Alcorn (collectively medical-provider Defendants).

320.    The medical-provider Defendants are private individuals, not governmental actors, and are therefore not entitled to any immunity under the CGIA.

321.    At all times relevant to this Complaint, Mr. Long was under the medical responsibility, care, and treatment of these Defendants.

322.    The medical-provider Defendants and other NatCore medical staff had a duty to provide care to people incarcerated at FCDC, including Mr. Long.

323.    The medical-provider Defendants had a doctor-patient, nurse-patient, or EMT-patient relationship with Mr. Long and were acting within the scope of their employment.

324.     With respect to their care and treatment of Mr. Long, the medical-provider Defendants owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.  Through their actions and omissions, the medical-provider Defendants breached their respective standards of care and were negligent in failing to properly assess, monitor, treat, and care for Mr. Long.

325.     These duties of care are informed by state law.  Under Colo. Rev. Stat. § 16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment."  The provision of adequate medical treatment and humane care is a statutory obligation.

326.     NatCore also had a duty to implement reasonable policies and exercise reasonable care in the training of medical workers at FCDC.  NatCore breached its duty to exercise reasonable care in the training of medical workers in a manner that provided the people under their care with reasonable medical care and treatment.

327.     As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff Gage Long has suffered damages, losses and injuries in an amount to be determined by the jury at trial.  These damages include, inter alia, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other purely noneconomic damages as allowed under the Colorado Wrongful Death Act.

328.     Plaintiff Gage Long suffered and continues to suffer economic and non-economic damages due to Defendants' negligent conduct toward his father, including, but not limited to, economic and non-economic damages for grief, loss of his father's companionship, impairment in the quality of his life, inconvenience, pain and suffering, and extreme emotional distress.

Plaintiff Gage Long is therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages.

329. Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regards to the consequences to Mr. Long and Plaintiff Gage Long.

330. Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

### SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 12133 - Title II of the Americans with Disabilities Act (Survival Claim) (by Plaintiff Estate against Defendants Cooper (in his official capacity) and Board of Commissioners for the County of Fremont)

331. Plaintiff Estate incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

332. Plaintiff Estate brings this claim against Defendants Cooper (in his official capacity) and Board of Commissioners for the County of Fremont (collectively Fremont County).

333. Mr. Long was an individual with a disability, and these Defendants regarded him as having a disability.

334. Mr. Long had been diagnosed with bipolar disorder, anxiety, and depression. These diagnoses interfered with Mr. Long's basic life activities, including caring for himself, communicating, thinking, interacting with others, and working, among others.

335. Under Title II of the ADA, each state and local government and each agency of such a government is obligated to evaluate its current services, policies, and practices, and their

effects, that do not or may not meet the requirements of Title II of the ADA, and if modification of services, policies, and practices is needed to achieve compliance, make the necessary modifications.

336.    To assure compliance with the ADA, local and state governments should conduct training of their employees.  In that way, each state and locality and each instrumentality of such a state or locality can assure that individuals with disabilities are provided services in a manner that complies with the ADA.

337.    Fremont County did not provide adequate training for its staff and subcontractors on how to interact with and accommodate mentally disabled individuals experiencing mental-health crises.

338.    The failure of Fremont County to properly train FCDC and NatCore staff on how to interact with and provide non-discriminatory services to a mentally disabled individual experiencing a mental-health crisis violated Title II of the ADA.

339.    Additionally, Defendants Cooper, Irvine, Hammel, Vaught, and others violated Mr. Long's rights under Title II of the ADA by excluding him from receiving the benefit of the jails' medical services and proper classification, housing, and observation, solely because of his mental disability.

340.    At all times relevant to this Complaint, Fremont County employed Defendants as FCDC staff or NatCore medical staff and is vicariously liable for their actions under Title II of the ADA.

341.    Defendants' violations of Title II of the ADA proximately caused Mr. Long's death.

342.     Defendants' violations of Title II of the ADA caused Mr. Long to endure severe

emotional pain and suffering during his weeks of incarceration without proper care or medical

observation, and Defendants' violations led to Mr. Long's traumatic death.

**SEVENTH CLAIM FOR RELIEF**
**29 U.S.C. § 794 - Section 504 of the 1973 Rehabilitation Act (Survival Claim)**
**(by Plaintiff Estate against Defendants Cooper (in his official capacity) and Board of**
**Commissioners for the County of Fremont)**

343.     Plaintiff Estate incorporates by reference the foregoing paragraphs of this

Complaint as if set forth fully herein.

344.     Plaintiff Estate brings this claim against Defendants Cooper (in his official

capacity) and Board of Commissioners for the County of Fremont (collectively Fremont

County).

345.     On information and belief, at all times relevant to this Complaint, Fremont

County received federal funding, including funding for the FCSO.

346.     Under Section 504 of the 1973 Rehabilitation Act, "[n]o otherwise qualified

individual with a disability in the United States ... shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance."

347.     Mr. Long was an individual with a disability, and these Defendants regarded him

as having a disability.

348.     Mr. Long had been diagnosed with bipolar disorder, anxiety, and depression.

These diagnoses interfered with Mr. Long's basic life activities, including caring for himself,

communicating, thinking, interacting with others, and working, among others.

349.     Fremont County did not provide adequate training for FCDC officials or NatCore staff on how to interact with mentally disabled individuals experiencing a mental-health crisis.

350.     The failure of Fremont County through the FCSO to properly train Defendants in how to interact with and provide services to mentally disabled individuals experiencing a mental-health crisis violated Section 504 of the Rehabilitation Act.

351.     Additionally, Defendants Cooper, Irvine, Hammel, Vaught, and others violated Mr. Long's rights under Section 504 of the Rehabilitation Act by excluding him from receiving the benefit of the jail's medical services and proper classification, housing, and observation, subjecting him to discrimination resulting in his death, solely because of his mental disability.

352.     At all times relevant to this Complaint, Fremont County employed Defendants as FCDC staff or NatCore medical staff and is vicariously liable for their actions under Section 504 of the Rehabilitation Act.

353.     Defendants' violations of Section 504 of the Rehabilitation Act proximately caused Mr. Long's death.

354.     Defendants' violations of Section 504 of the Rehabilitation Act caused Mr. Long to endure severe emotional pain and suffering during his weeks of incarceration without proper care or observation to his traumatic death.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to enter judgment in their favor and against each of the Defendants, and award them all relief as allowed by law and equity, including, but not limited to, the following:

a)     All appropriate relief at law and equity;

b)      Actual economic damages as established at trial;

c)      All available compensatory, non-economic, consequential, and economic

damages, including, but not limited to, emotional distress, suffering, humiliation,

inconvenience, mental anguish, loss of enjoyment of life, and other pain and

suffering on all claims allowed by law in an amount to be determined at trial;

d)      Punitive damages for all federal claims allowed by law in amount to be

determined at trial;

e)      Punitive damages on state law claims upon suitable amendment after completion

of substantial discovery;

f)      Pre-judgment and post-judgment interest at the highest lawful rate;

g)      Attorneys' fees and the costs associated with this action as allowed by law,

including expert-witness fees; and

h)      Any further relief that this Court deems just and proper, and any other relief as

allowed by law.

PLAINTIFFS REQUEST A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.

Dated this 2nd day of April 2021.

Respectfully submitted,


s/Aurora L. Randolph_____
**Aurora L. Randolph**
ALR Civil Rights LLC
9888 W. Belleview Ave.
Suite 2129
Denver, CO 80123
Phone: (303) 968-1703
Email: aurora@alrcivilrights.com
*Attorney for Plaintiffs*